FREDERICKA HOMBERG WICKER, Judge.
 

 [ 2This appeal arises from an insurance dispute. La Louisiane Bakery Company Ltd., plaintiffiappellee/insured, sought to recover wind-related damages for loss of business interruption in the wake of Hurricane Katrina. Lafayette Insurance Company, defendant/appellant/commercial insurer, argued that the policy’s anticon-current causation clause (“ACC clause”) barred recovery. Lafayette asserted that loss of utility service, flooding, and “sump pump” overflow — excluded perils — contributed concurrently or sequentially to the loss sustained by wind damage — a covered peril. The jury disagreed and found that La Louisiane sustained a loss of business income exclusively as a result of a covered loss. The judgment rendered in conformity with the jury verdict awarded La Loui-siane $83,247 for loss of business income; $25,000 for damages pursuant to La.R.S. 22:1220;
 
 [1]
 
 and, $25,000 for penalties pursuant to La.R.S. 22:1220. Lafayette now appeals. We find: (1) The jury was not manifestly erroneous in finding that the ACC clause was inapplicable. (2) The jury was not manifestly | ?,erroneous nor did it abuse its discretion in its award for loss of business income. (3) The jury was not manifestly erroneous in awarding bad-faith penalties. Therefore, we affirm.
 

 
 *21
 

 Facts
 

 La Louisiane, a commercial bakery owned by three partners, has operated for years in Harahan, Louisiana. Mr. Ovidio S. Fernandez, the bakery partner who regularly performed bakery maintenance and repairs, testified at trial about the damages the bakery sustained as a result of Hurricane Katrina. He stated that wind damages resulted in business interruption from August 29, 2005 to October 9, 2005. Mr. Fernandez explained that on the heels of the storm he conducted short-term repairs, including temporary repair of the roof and overhead door. Thereafter, the bakery hired a roofing contractor who completed the roof repair around September 23, 2005. According to Mr. Fernandez, typically the health department would not permit him to operate unless the building was water tight. Mr. Fernandez also testified that the bakery lacked power for 2 to 5 days. But, he was unable to open his business even after the power came back on. When electricity was restored, the bakery ovens and mixers would not operate. Without operational equipment, Mr. Fernandez could not open his business.
 

 While Mr. Fernandez testified that the bakery could not re-open its doors to a 60-65% operation until October 9, 2005, Lafayette, the bakery’s wind insurer, introduced a survey form, purportedly from the Louisiana Health Department, which it argued showed that the bakery was open on September 15. This form, purportedly signed by a La Louisiane owner/representative on September 15, 2005, indicated that the bakery regained power on September 12, 2005 with no physical damage to the building on that date.
 

 |4Mr. Fernandez denied that the handwriting or signature on the form was his and indicated that he did not know who signed the document.
 

 La Louisiane had both a flood insurance policy and a wind damage policy. Only the wind policy, however, provided for loss of business interruption. On September 23, 2005, Lafayette Insurance Company, the wind damage insurer, sent Dan Potter, its independent Crawford Company adjuster, to inspect the bakery. Mr. Potter reported to Lafayette that there was 1 to 2½ inches of flooding within the building along with minimal wind damage. Lafayette paid the wind damage loss reported by Mr. Potter, including damage to the computers. It did not, however, pay for business interruption loss. Mr. Potter’s report stated that the estimated loss for the dwelling (gross loss) was $4651.33 less the deductible of $3002 for a net loss of $1649.33. For the contents, the gross loss was $1750 with a deductible of $2636, leaving a net loss of no claim.
 

 Mr. Stephen Pierce was the bakery’s flood adjuster. He testified that he inspected the bakery on October 6, 2005. While at the bakery Mr. Pierce saw people working, however he did not know whether they were cleaning or baking. He opined that the business was operating.
 

 Interestingly, Mr. Fernandez stated that he did not call the flood adjuster. Mr. Fernandez gave only Mr. Potter, the Lafayette wind adjuster, the dimensions of every piece of equipment in every room as well as photographs. Mr. Fernandez thought it was odd that Mr. Pierce, the flood adjuster, already had the information and pictures that Mr. Fernandez had given to Mr. Potter when he arrived at the bakery.
 

 The flood adjuster testified that he made an educated guess that the water line inside the building was approximately 10 inches or lower and that there was minimal flooding. The repairs that he allowed for were not completed on October |⅞6
 
 *22
 
 when he did his inspection. The flood insurer paid La Louisiane $56,354.26 for building damage and $13,500 for loss of contents. Among other things, the flood insurer paid the cost of cleanup. Mr. Pierce testified that he discussed the nature of the flooding with Mr. Fernandez and Mr. Fernandez agreed with the water levels that he used.
 

 Mr. Potter, the wind adjuster, concluded in his report that the property suffered wind damage to the roof as well as interior ceiling damage and that water fell upon a few of the bakery contents. Mr. Potter’s report contained photographs of rust stains on the walls showing the runs of paint or rust material stain down the walls from the ceiling area.
 

 Other photographs also documented damage to the overhead door, and a paint damaged window near computer equipment indicating “wind driven water” entered around the framing and put waterspouts on the windowsill. Mr. Potter concluded that there was major flooding but he also thought there was a “window of benefit” for loss of income, as noted in his report:
 

 [Tjhere is some loss of income but most really was caused by the flooding and loss of power along with mandatory evacuation. I have requested for the insured to provide us with accounting information about the loss of income. I would think some window of benefit would be available as he was shut down due to no power as well as wind damages to the roof which are covered under this policy. The flooding really shut him down for some period.
 

 Mr. Potter reported that Mr. Fernandez told him the operation was back and running on September 16, 2005. However, most of his employees were nowhere to be found.
 

 Only Mr. Fernandez testified about the bakery’s condition in the week following the hurricane — September 5 or 6. Because there was no electricity, Mr. Fernandez could not inspect the interior at that point. Outside, he saw a debris line more than five feet from the door. Therefore, he assumed that no flood water 1 fientered the building. The garage door, however, collapsed allowing water to enter. But, he saw no indication that there had been any type of floodwaters touching the garage door. Shortly thereafter, around September 6 or 7, he was able to inspect the bakery’s interior.
 

 Mr. Fernandez testified that he noticed additional damage when he was able to enter the bakery:
 

 Two roof sheets were peeled back over the office hallway letting sunshine enter; roof caps were missing; flashing was missing; the roof fan’s blades were completely gone; all of the exhaust stacks for the ovens and water heater were missing; the heating element for the front air-conditioning unit was missing; everything in the office was wet, including the carpet; the office wall and panel were stained from water entering from above, indicating a roof leak; and, the insulation in the ovens was wet from water coming from the roof.
 

 As Mr. Fernandez explained, overwhelmingly the bakery equipment was raised above the floor with engines and other electrical and mechanical components located above the equipment. According to Mr. Fernandez, the 8-10 feet tall large ovens were not operational due to wind-driven rain from the roof. He explained that the lowest point on any of the ovens was 3 to 6 inches from the ground. Water entered from the opening created by the damaged roof causing rain to enter the ovens. He explained that if the stack were exposed, as in this case, water would get into the insulation in the
 
 *23
 
 oven and then travel onto the floor. After the hurricane, he saw no protection to prevent water from running down the stack into the insulation. He saw no evidence or indication that floodwaters touched his ovens.
 

 Mr. Fernandez testified none of the other kitchen items, such as mixers, were damaged by floodwaters. There were no motors, equipment or wires from 1 ½ feet 17below on the large 3 ½ foot tall mixers. The freezer was off the floor by 3 ½ feet. All of the electronics, compressors, and fans were bolted on the roof of the freezer unit. He stated that the refrigerator and the elevated freezer should have been sealed and the water should not get in there unless it entered from above. The “sheeter,” which was used to prepare the dough, was mounted on legs and wheels. The chain and motors were probably 3 to 4 inches off the ground to 6 ½ to 8 inches above the ground. The cast iron “rounders,” which were used to make rolls, had a pan that was almost 2 or 3 inches from the floor. It had a pump that was probably about 6 ⅜ to 8 inches off the floor.
 

 He stated that smaller mixers sat directly on the floor but these mixers were 15 to 20 feet from the front door.
 

 In addition, Mr. Fernandez testified that there was probably water in the walk-in freezer from melted ice resulting from the power outage.
 

 Mr. Fernandez stated that the only flood that he could possibly even account for would be to the left rear side of the building. Even before the hurricane, they would occasionally get water in that rear storage area. But because of the floor layout, water ran into the wall and not into the bakery. Although the bags were a little wet, no floodwaters touched any of his bagged products containing flour or starch. There was a little water from the pump that possibly wet the pallet. The wicker effect of the wood touching some bags made those bags sweat. The health department told him to discard the flour. However, there was nothing wrong with that flour. The bags that were on the other side of that fire wall were wet from above and not from below.
 

 Mr. Fernandez testified that Mr. Potter, the wind adjuster, asked him to provide tax returns, profit and loss statements, and payroll expenses in order to process a business interruption claim. Because Mr. Fernandez was anxious to have [ Shis claims processed, he agreed to meet Mr. Potter in Florida in October 2005 in order to provide Mr. Potter with the requested documents. Mr. Potter assured him that he would turn it in to headquarters, which Mr. Fernandez assumed was the insurance company. However, when Mr. Fernandez arrived in Florida, Mr. Potter told him he forgot that he had another meeting. Mr. Potter told Mr. Fernandez to mail the documents to him.
 

 Because he was not receiving satisfaction of his business interruption claim, Mr. Fernandez began calling the insurance company at least twice a month from October 2005 to August 2006. According to Mr. Fernandez, he was given the “runaround.” When he called, someone from the company told him to call his agent or the adjuster. When he called his agent, his agent told him he had to call the insurance company. When he called the adjuster, the adjuster said he turned all that in and it was out of his hands, to call the insurance company. According to Mr. Fernandez, the insurer never told him at any time during this time frame that he had submitted insufficient information to make a business interruption claim. Mr. Fernandez testified that he asked his agent what other information was needed and whether there was a special form.
 
 *24
 
 His agent told him the insurer was supposed to have everything it needed.
 

 Mr. Fernandez stated that there were times when he called that he was placed on hold for 10 or 15 minutes and ignored, without inquiry as to the policy number or the name of the company. During that time period from October 2005 to August 2006, Lafayette never informed him that they were not going to pay his claim because it was caused by flood.
 

 Patricia Wessel, Lafayette’s claim supervisor, testified that an independent adjuster like Mr. Potter, was “the eyes and ears of the claim.” According to Ms. Wessel, Lafayette relied on the outside adjuster for information. She testified that Ronce the independent adjuster obtained the information, conducted an inspection, and obtained financial documents, she expected the adjuster to communicate that information to the home office.
 

 Ms. Wessel testified that if the claim were being denied as covered by flood, this should be communicated to the insured. Ms. Wessel identified various claims adjusters’ log notes from August 2005 to August 2006 to document the activities that occurred on the claim, including communications with the insured, agent, and the independent adjuster.
 

 Ms. Wessel testified about the October 10, 2005 log note, which indicated that the insured called expressing concern about his business interruption claim. She agreed that Lafayette had knowledge that La Louisiane must have filed a business income claim. She stated according to the note it was explained that Lafayette could not address this issue until they received the adjuster’s report. The insured was asked whether he had contacted his adjuster to see if the report was completed. She stated that she supposed they could have contacted Mr. Potter and she was sorry that Mr. Fernandez felt that he was getting the “runaround.” She testified that she had no information to dispute or to verify that Mr. Fernandez mailed the documents to Mr. Potter.
 

 According to a log note for December 28, 2005, the adjuster was waiting for documentation from the insured to support his business interruption claim. The file remained open pending this information. Ms. Wessel testified, however, that from October 10, 2005 to December 28, 2005, no one from Lafayette attempted to contact Mr. Potter and find out if he had the financial documents. There was no indication in the log notes that Lafayette attempted to follow up directly with La Louisiane to find out the status of the business interruption documents. Also, by January 2006, there was still no indication that Lafayette attempted to call the | inadjuster, the insurance agent, or the insured to find out the status of the business interruption claim.
 

 After learning that the adjuster thought there was a “window” of benefit, Lafayette relied on the Crawford adjuster (Mr. Potter) who said he was going to get the information and present it to them. They continued with an open file to see what evidence the insured would present. However, Ms. Wessel stated that the major damage was flood-related and not covered under the policy. Still, she agreed that Lafayette paid for the damaged computers.
 

 Ms. Wessel testified that up until the time of the litigation, Mr. Fernandez had not presented any evidence to support a business income claim. So, Lafayette was not in a position to either deny the claim or accept the claim. According to Ms. Wessel, Lafayette never issued any correspondence to La Louisiane denying the claim for flood, ACC clause, or off-premises power failure.
 

 
 *25
 
 As to damages, before trial, Mr. Fernandez in answer to an interrogatory estimated his business income loss as around $57,000. At trial, he stated he lost $100,000 to $150,000. He testified that earlier figure was incorrect.
 

 If covered under the Lafayette policy, the policy provides for loss of business income. Business income consists of three types of losses: (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; (2) Continuing normal operating expenses incurred, including payroll; and, (3) “Extra Expense.”
 

 Lafayette and La Louisiane each presented accounting experts to testify as to business loss from August 29 to October 8 based on financial documents. Lynn Mitchell, Lafayette’s expert, and Jack B. Ease, La Louisiane’s expert, agreed on similar figures for loss of net income of $24,690, and $24,906, respectfully. Mr. Ease, however, included officer’s salaries in his calculation of continuing expenses |nthat the business had incurred or paid for the period of time while Ms. Mitchell did not. Ms. Mitchell calculated $24,393 in continuing expenses while Mr. Ease calculated $59,495. Ms. Mitchell testified, however, that in an “S” corporation, as in this case, if the officers were working and money was owed to them, officers’ salaries should be included.
 

 Mr. Ease, unlike Ms. Mitchell, calculated as business loss extra expenses or cleanup expenses to get the business back in operation. He concluded these extra expenses totaled $19,146. He testified, however, that he did not know whether La Loui-siane was paid these expenses but if so, the bakery should not get double recovery. Therefore, in the event there was no flood payment for extra expense, Mr. Ease testified that La Louisiane sustained a loss of business income of $103,547 while Ms. Mitchell found $49,083.
 

 Lafayette also asked Ms. Mitchell to calculate business loss for the shorter period of August 29 to September 15. She calculated $11,428 in continuing expenses and $10,581 in loss net income for a total of $22,009.
 

 The jury found that La Louisiane sustained $83,247 for loss of business income exclusively as a result of a covered loss. The jury further found that La Louisiane suffered damages as a result of Lafayette’s acting arbitrarily, capriciously, or without probable cause in failing to pay the claim within 60 days of receiving satisfactory proof of loss. The jury awarded $25,000 for damages and, $25,000 for penalties.
 

 Lafayette now appeals the jury verdict in favor of La Louisiane.
 

 The ACC Clause/Loss of Business Income
 

 Lafayette makes a two-pronged argument. First, it asserts that Mr. Fernandez admitted that the flood damage caused the bakery to sustain business | ^interruption loss. Second, Lafayette argues that the jury verdict should be reversed because the ACC clause precludes recovery.
 

 Alleged Admissions
 

 Lafayette argues that Mr. Fernandez knew and accepted the scope of the flood adjustment by Mr. Pierce, the flood adjuster.
 

 Mr. Pierce testified that he discussed the nature of the flooding with Mr. Fernandez and Mr. Fernandez agreed with the water levels that he used. On the other hand, Mr. Fernandez testified that he told Mr. Potter, the wind adjuster, there was no flood damage. He told him he had water that came from the roof and he showed Mr. Potter the back of the ovens. Mr. Potter told him that if he had
 
 *26
 
 any water inside the building that was a flood claim. But, Mr. Fernandez told Mr. Potter that there was no water from the street, none next door, or to the rear. He questioned the determination there was flood damage. It was Mr. Potter who suggested that Mr. Fernandez place a flood claim in order to hasten the process. Mr. Fernandez never suggested to anyone that this claim should be processed under the flood policy. He did not know how it came about that the flood insurer got involved. He stated that he never gave Lafayette any indication that he did not want to pursue a business interruption claim because he believed the damages were related to flood. He also testified that he was not seeking double recovery.
 

 The appropriate standard for appellate review of factual determinations in civil cases is the manifest error-clearly wrong standard, which precludes the setting aside of a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety.
 
 Hall v. Folger Coffee Co.,
 
 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98 (citation omitted). In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further | ^determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous.
 
 Parish Nat. Bank v. Ott,
 
 02-1562, pp. 7-8 (La.2/25/03), 841 So.2d 749, 753-54 quoting
 
 Stobart v. State Through DOTD,
 
 617 So.2d 880, 882 (La.1993). The appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.
 
 Pinsonneault v. Merchants & Farmers Bank & Trust Co.,
 
 01-2217, p. 11 (La.4/3/02), 816 So.2d 270, 279. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently.
 
 Detraz v. Lee,
 
 05-1263, p. 5 (La.1/17/07), 950 So.2d 557, 561 citing
 
 Pinsonneault, supra.
 

 The jury weighed the conflicting testimony and attached greater weight to Mr. Fernandez’s testimony. Mr. Fernandez was the person who first observed the bakery’s storm damage. He testified he saw no water line indicating that flood waters had entered the building during the storm. We find no manifest error in the jury’s factual finding that Mr. Fernandez was credible in disputing Mr. Pierce’s testimony that Mr. Fernandez had agreed with him during his bakery inspection regarding the water line measurement. The jury could have reasonably determined that Mr. Fernandez’s first-hand observations supported his testimony that he disputed the two adjusters’ water line assessment.
 

 Lafayette also argues that the plaintiff judicially confessed in its supplemental and amending petition that the business interruption loss was caused by the flood. Lafayette also relies on the alleged confession to dispute La Louisiane’s allegation that it sustained only wind damage. The argument lacks merit.
 

 | U“A judicial confession is a declaration made by a party in a judicial proceeding.” La.C.C. art. 1853. “That confession constitutes full proof against the party who made it.”
 
 Id. “A
 
 judicial confession is indivisible and it may be revoked only on the ground of error of fact.”
 
 Id.
 

 A declaration that expressly acknowledges an adverse fact and is made by a party in a judicial proceeding is a judicial confession that constitutes full proof against the party who made it.
 
 Goines v. Goines,
 
 08-42, p. 5 (La.App. 5 Cir.
 
 *27
 
 6/19/08), 989 So.2d 794, 797 (citations omitted). An admission in a pleading falls •within the scope of a judicial confession and is full proof against the party making it. A judicial confession must be explicit and not merely implied.
 
 Id.
 

 Here, we find no explicit judicial confession. The pertinent paragraph states:
 

 Further, Defendant failed to settle the claim for the loss of business income. To date, Defendant failed to remit any payments for the loss of business income. In addition to damages from wind-driven rain, Defendant-insurer is liable for any and all damages arising from the levee breaches, as per
 
 In Re Katrina Canal Breaches Consolidated Litigation,
 
 Civil Action No. 06-4182(E)(2) [sic] in the United States District Court for the Eastern District of Louisiana. Accordingly, Defendant-insurer’s policy exclusion of flood damages is not applicable to the rising water and/or flood damages arising from the levee breaches. Said damages include but are not limited to damages to business personal property and loss of business income. Defendant-insurer’s refusal to tender claim payment pursuant to the policy at issue is arbitrary, capricious, without cause and in bad faith.
 

 At the time, the Federal Eastern District of Louisiana held that the term “flood” was ambiguous in the context of levee breaches resulting from the inundation of water. The court held that the ambiguity therefore would be construed in favor of the insureds and thus in favor of a finding of coverage for water damage caused by flooding resulting from negligently maintained levees. In
 
 In re Katrina Canal Breaches Consolidated Litigation,
 
 466 F.Supp.2d 729 (E.D.2006),
 
 affirmed in part, vacated in part,
 
 495 F.3d 191 (5th Cir.2007),
 
 cert. denied, Xavier University of Louisiana v. Travelers Cas. Property Co. of America,
 
 552 U.S. 1182, 128 S.Ct. 1230, 170 L.Ed.2d 63 (2008),
 
 cert. denied, Chehardy v. Allstate Indem. Co.,
 
 552 U.S. 1182, 128 S.Ct. 1231, 170 L.Ed.2d 63 (2008).
 

 That holding is no longer the law. The Federal Fifth Circuit rejected the ambiguity argument in
 
 In re Katrina Canal Breaches Litigation, supra,
 
 495 F.3d at 210. Likewise, in
 
 Sher v. Lafayette Ins. Co.,
 
 07-2441, p. 10 (La.4/8/08), 988 So.2d 186, 196, the Louisiana Supreme Court held that the term, “flood” used in connection with an ACC clause was not ambiguous. The court held: “Because the use of the plain, ordinary and generally prevailing meaning of the word ‘flood’ in the exclusion is reasonable and does not conflict with any statutory provision or public policy, Lafayette is entitled, through use of the term ‘flood’, to limit its own liability and impose and enforce such reasonable conditions upon the policy obligations that the insurer has contractually assumed.” There, the Court approved enforcement of an ACC clause.
 

 Lafayette states that after the Louisiana Supreme Court rendered its
 
 Sher
 
 opinion, the plaintiff took the exactly opposite stance at trial and the plaintiff should have been bound by its pleadings.
 

 We are unpersuaded that the above allegations in the supplemental petition constitute a judicial confession. Importantly, the plaintiff continued to allege that it sustained wind-driven rain damage. The statement in question does not seem to have been intended to waive the plaintiffs right to contest the issue of alleged business interruption loss from wind-driven rain.
 

 Furthermore, “courts have taken into account a party’s otherwise consistent opposition to the fact alleged to have been confessed.... Thus, the presence of con
 
 *28
 
 sistent opposition to the allegedly confessed fact weighs against finding a confession.”
 
 Opti-Flow, LLC v. Production Services Intern., Ltd.,
 
 04-1357, p. 4 (La.App. 3 Cir. 6/1/05), 903 So.2d 1171, 1174,
 
 writ denied,
 
 05-1748 (La.1/13/06), 920 So.2d 240 (citation omitted).
 

 Finally, there was no evidence that Lafayette relied on an alleged judicial confession to its detriment or believed that there was no longer an issue as to whether wind-driven rain from the damaged roof and door caused business interruption loss. Here, the presence of consistent opposition to the allegedly confessed fact weighs against finding a confession.
 

 Other Factual Findings
 

 Lafayette argues that La Louisiane’s operations were suspended due to power outages from August 29 to September 12. In this regard Lafayette relies on the Louisiana Health Department Survey that allegedly stated there was no physical damage to the bakery and the bakery was operational on September 15. However, Mr. Fernandez testified that the handwriting and signature on the Louisiana form was not his and that he did not know who signed that document. Moreover, Mr. Fernandez testified that in addition to the state, the bakery was also subject to inspection by federal and parish agencies.
 

 Lafayette also relies on Mr. Fernandez’s testimony that he completed roof repairs in a half day. Lafayette further contends that flood adjuster Pierce stated the flood damages were sufficient to cause an interruption of plaintiffs operations and that La Louisiane was down until September 15, 2005. Lafayette argues that La Loui-siane’s operations were suspended because it had to clean out the muck from the flood.
 

 According to his report, Mr. Pierce inspected the premises a few days before Mr. Fernandez stated the bakery resumed operations. According to Mr. Pierce he observed people working that day but he did not know if they were cleaning or |17baking. When asked whether all of the damages he reported would have prevented the business from operating, Mr. Pierce responded: “It’s hard to say. I don’t know.”
 

 Again, the jury resolved credibility determinations in favor of Mr. Fernandez. He testified that he did not resume operation until October 9. He stated he worked long hours getting the bakery operational. He explained that he had to repair the ovens because these were not operational even after the electricity was restored. We find no manifest error.
 

 ACC Exclusion
 

 Lafayette alleges La Louisiane is precluded from further recovery because the bakery’s damages were not caused exclusively by a covered cause of loss. Lafayette relies on the policy’s anticoncurrent (ACC) clause^ which states:
 

 We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
 

 In essence the anticoncurrent clause states that if the bakery sustains damages which are caused in part by covered events and in part by excluded events the damages are not covered.
 

 The insurance policy lists the following pertinent exclusions to which the ACC clause applies:
 

 Utility Services
 

 The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.
 

 
 *29
 
 But, if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss of damage caused by that Covered Cause of Loss.
 

 Water
 

 (1)Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
 

 Jos- • ■ •
 

 (3) Water that backs up or overflows from a sewer, drainage or sump[.]
 

 As to damages caused by power failure, although the ACC clause excludes damages caused in part by power failure, a separate contract provision, “Coverage Extensions” provides for additional coverage. That provision states:
 

 Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises. Each of the Extensions is additional insurance.
 

 One of the extensions applicable here is the following:
 

 Premises Services-Direct Damages
 

 We will pay for loss of or damage to Covered Property described in the Declarations, caused by the interruption of service to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to the following property, not on the described premises:
 

 Power Supply Services, meaning the following types of property supplying electricity, steam or gas to the described premises:
 

 (1) Utility generating plants;
 

 (2) Switching stations;
 

 (3) Substations;
 

 (4) Transformers; and
 

 (5) Transmission lines.
 

 It does not include overhead transmission lines. The most we will pay for loss or damage under this Extension is $10,000[.]
 

 We have carefully reviewed these provisions concerning power failure. We find the discrepancy between the “Utility Services Exclusion” contained in the ACC part of the contract and the “Power Services Extension” contained in the “Coverage Extensions” part of the contract conflict creating ambiguity. Therefore, the exclusion must be construed against appellant, the insurer, and we conclude that the ACC clause does not bar recovery of business interruption loss caused by power failure.
 
 Succession of Fannaly v. Lafayette Ins. Co.,
 
 01-1355, p. 4 (La.1/15/02), 805 So.2d 1134, 1138 citing La.C.C. art. 2056. (“[I]f an ambiguity remains after applying the general rules of contractual interpretation to an insurance contract, the ambiguous contractual provision is construed against the insurer who furnished the contract’s text and in favor of the insured.”).
 

 We now turn to the ACC clause as it applies to the flood and “sump pump” exclusion.
 

 In
 
 Leonard v. Nationwide Mut. Ins. Co.,
 
 499 F.3d 419, 430-31 (5th Cir.2007),
 
 cert. denied,
 
 552 U.S. 1310, 128 S.Ct. 1873, 170 L.Ed.2d 745 (2008), the Federal Fifth Circuit explained a similar ACC clause. The court stated there were three discrete categories of damage: (1) damage caused exclusively by wind; (2) damage caused exclusively by water; and (3) damage caused by wind “concurrently or in any sequence” with water. The only species of damage covered under the policy was damage caused exclusively by wind. The court said that if wind and water synergistically caused the same damage, such damage was excluded. In other words, if a portion
 
 *30
 
 of the property damage was caused by the concurrent or sequential action of water-or any number of other enumerated waterborne perils-the policy clearly disallowed recovery.
 

 Here, the jury found that La Louisiane’s damage was caused exclusively by wind and therefore covered under the policy.
 

 Lafayette points out that Mr. Fernandez testified water backed up due to a non-functioning “sump pump.” So, even assuming the property did not flood, the “sump pump” exclusion applied. Lafayette also argues that water entered through the roof and flood entered at ground level, acting concurrently or syner-gistically to cause the same damage.
 

 |2nLa Louisiane responds that the ACC clause is not applicable because it sustained independent damages.
 

 Lafayette also argues that the jury erred in awarding loss of business income that was not caused exclusively by a covered cause of loss.
 

 The insurance policy covers loss of business income when the suspension of business operations is “caused by direct physical loss of or damage to property ... resulting from any Covered Causes of Loss” as follows:
 

 Business Income
 

 We will pay for the actual loss of business income you sustain due to the necessary suspension of your “operations” during the “period of restoration.” The suspension must be caused by direct physical loss of or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet caused by or resulting from any Covered Causes of Loss.
 

 We conclude that the jury was not manifestly erroneous in crediting Mr. Fernandez’s testimony over that of the adjusters. Mr. Fernandez, who routinely repaired and maintained the building and the bakery’s components, was familiar with their pre-hurricane condition. He testified in great detail about raised ovens, mixers, and other items. Mr. Fernandez was the first person to see the condition of the bakery after the hurricane. He saw no debris line indicating that flood waters entered the building. Mr. Potter did not inspect the premises until about two weeks after Mr. Fernandez did so. And Mr. Pierce did not perform an inspection until much later, on October 6. Mr. Pierce “guessed” at the water line and reported minimal flooding. Mr. Potter reported minimal wind damage and that the flooding really shut the bakery down for a period.
 

 The keys to the operation were the ovens and other kitchen equipment as well as the computer equipment. Lafayette paid for the computer repair. Mr. Fernandez testified that light entered that office because of roof damage. He saw J^jindications on the wall of water running down from the top of the wall. The ovens were damaged as a result of wind-driven rain entering the ovens from above. Although Mr. Fernandez thought there might be water in the rear area, he explained that water would not run to the bakery from there. Additionally, he stated that no floodwaters touched any of his bagged products containing flour or starch.
 

 It was reasonable for the jury to conclude that the bakery did sustain direct physical loss and damage as a result of the ■wind and rain, and not due to direct contact with the floodwaters. Further, we find no manifest error in the jury’s finding that these losses and damages, alone, caused a suspension in the operation of the bakery.
 

 
 *31
 
 We now turn to Lafayette’s argument that even assuming that the jury did not err in finding that the suspension of the bakery’s operations was directly caused by a covered loss, the jury erred in finding that La Louisiane otherwise proved its losses.
 

 Proof of loss of business income
 

 Under the Lafayette policy, Business Income means the:
 

 (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
 

 (2) Continuing normal operating expenses incurred, including payroll.
 

 The policy also provides for payment of “Extra Expense.”
 

 The Lafayette policy further provides that “Business Income Loss will be determined based on” the following:
 

 (1) The Net Income of the business before the direct physical loss or damage occurred;
 

 (2) The likely Net Income of the business if no loss or damage occurred;
 

 (3) The operating expenses, including payroll expenses, necessary to resume “operations” with the same quality of service that existed just before the direct physical loss or damage; and
 

 1 g2(4) Other relevant sources of information, including:
 

 (a) Your financial records and accounting procedures;
 

 (b) Bills, invoices and other vouchers; and
 

 (c) Deeds, liens or contracts.
 

 At the outset, Lafayette challenges the competence of the plaintiffs expert accountant and argues that his testimony should have been excluded or limited. However, before Mr. Jack Kase testified, the trial judge informed the jury that the parties stipulated to Mr. Ease’s expertise in the field of certified public accounting. Because Lafayette accepted Mr. Kase as an expert, it cannot assert that the testimony is inadmissible at this stage of the proceeding.
 

 Lafayette also argues that La Louisiane presented only speculative and artificially inflated figures to support its claim for loss of business income. Lafayette asserts that this Court should reverse the jury’s finding that the plaintiff was entitled to continuing expenses and extra expenses. Lafayette argues that with regard to payroll expenses as an item of continuing expenses that item was estimated without any proof that these expenses were actually incurred. Thus, according to Lafayette, Mr. Ease’s figure for payroll was unsupported and speculative and did not adhere to the policy’s provision that continuing expenses are those that are incurred. Lafayette also argues that the award should be based on a shorter time period. Lafayette relies in this regard upon the health department survey that the business had resumed on September 15th. According to Lafayette, the “period of restoration” ended on September 15 rather than on October 9.
 

 “Period of restoration
 
 ”
 

 The jury awarded a total of $83,247 for loss of business income. Mr. Kase projected a total loss of $103,547 for the period ending October 9. Since Ms. Mitchell projected losses of $49,083 and $22,009 for the period ending on October 8, and January 15, respectfully, the jury evidently concluded — by accepting the | ^larger figure — that the period of restoration ended on October 8. Lafayette argues that the jury erred in basing an award on a longer time period.
 

 The insurance policy states that Lafayette will pay for the actual loss of business income that La Louisiane sustained due to the necessary suspension of its operations
 
 *32
 
 during the “period of restoration.” “Period of restoration” is defined as ending on the “date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.”
 

 Lafayette relies for its position on the health department document that was introduced into evidence but never identified by Mr. Fernandez. This document, however, begs the question. The survey merely states the date on which electrical power was restored. It is silent as to the date on which the roof was repaired, the bakery equipment became operational or on which the health department permitted the bakery to re-open. On the other hand, the jury heard testimony from Mr. Fernandez regarding the extent of business interruption. Mr. Fernandez, a partner in the company, testified that he probably spent 16 to 18 hours a day working to re-open the business. The bakery employed a minimum of 60 to 70 employees and operated seven days a week. The bakery had cash flow problems after the hurricane. At the time he got the check from the flood insurer, Mr. Fernandez was very concerned about families returning to work. He had no place of his own anymore. He and his partner used their own funds to keep the bakery going. The bakery did not have any sales in the month of September. When La Louisiane reopened on October 9, the bakery was operating around a maximum of 60 to 65% capacity. Furthermore, despite the statement in the alleged health department survey that as of September 15, there was no physical damage to the building, Mr. Fernandez testified otherwise. He testified that the contractor did not complete the roof repair until around September 23rd. Also, Mr. Pierce, the flood adjuster, [^testified that the damages he allowed for were not complete at the time of his inspection on October 6 even though the business appeared to be operating.
 

 Mr. Fernandez testified that the computers, ovens, and mixers that were necessary for operating the business were damaged by the wind-driven rain. He also testified that the bakery did not get a fully operational garage door until three months later. He stated that the health department let him slide without a proper door although under ordinary circumstances that would not be the case.
 

 In determining the “period of restoration,” the jury credited Mr. Fernandez’s testimony over that of conflicting testimony from Mr. Pierce that the business appeared operational on October 6 and the report that Mr. Fernandez denied knowledge of. Based on the extent of the damage reported, the jury could have reasonably determined that a 41-day period was reasonable under the circumstances. Thus, we find no manifest error.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989).
 

 Cleanup Expenses
 

 Mr. Ease presented a figure of $19,146 for repair and cleanup expenses, while Ms. Mitchell did not include these extra expenses. Lafayette questions the award of extra expenses for cleanup as double recovery since the flood insurer paid that expense. La Louisiane responds that the jury did not award extra expenses. We agree.
 

 The jury awarded a total of $83,247 for loss of business income. According to Mr. Ease’s trial testimony, the plaintiff sustained losses of $103,547 consisting of loss of net income of $24,906, repair and cleanup expenses of $19,146, and continuing expenses of $59,495. According to Lafayette’s expert, Ms. Mitchell, the calculation of net income loss was $24,690 and continuing expenses was $24,393 for a total of $49,083.
 

 
 *33
 
 Igjt is apparent the jury relied heavily on Mr. Ease’s figures. However, Mr. Ease testified that he never determined whether La Louisiane made a claim for any of its cleanup expenses. But he stated, if these were paid, they should not be paid twice. There was undisputed evidence at tidal from Mr. Pierce’s deposition testimony and report as well as Mr. Fernandez’s testimony that the flood insurer paid for cleanup. Thus, the $83,247 jury award, which was $20,300 less that the total figure, indicates that jury disallowed extra expenses in order to avoid double recovery in light of Mr. Ease’s instruction. Therefore, Lafayette’s argument regarding double recovery is moot.
 

 Continuing Expenses
 

 Lafayette asserts that Mr. Ease’s loss figures included $65,356 in payroll, which according to Lafayette, was not covered under the policy because it was not incurred. Mr. Ease, however, did not testify at trial that La Louisiane was owed that payroll amount. He testified that the continuing expenses that the business had incurred or paid for the period of time was $59,495 rather than $65,356. Mr. Ease updated his original report that had previously included $65,356 as payroll expenses. Among such other continuing expenses as, for example, bank charges, rent, advertising, and insurance, his current report did not list payroll expenses as one of the continuing expenses. The report did, however, list officers’ salary in the amount of $24,234, an award that Lafayette also disputes.
 

 Lafayette argues that La Louisiane inflated its loss of business income claim and that Mr. Ease was biased. Lafayette asserts that La Louisiane did not introduce bills, invoices, or payroll journals to substantiate the officers’ salaries. Furthermore, Lafayette states that no payroll expenses were incurred in September 2005.
 

 12f,The Lafayette policy does not mandate the use of payroll journals. Moreover, financial records and accounting procedures are included among the relevant sources of information used to calculate business loss. Mr. Ease and Ms. Mitchell used relevant sources of financial information from profit and loss statements. In addition, Ms. Mitchell reviewed Mr. Ease’s reports. According to Mr. Ease, he also used tax returns. Mr. Ease explained that while he did not base his determination on payroll records, he did consider the profit and loss statements and tax returns. He explained that because there were cash flow problems, La Louisiane could not pay any expenses until it received the funds. The officers, however, were paid after the hurricane. Salaries were paid in December 2005.
 

 Mr. Ease performed a historical analysis of the bakery’s past experience to determine the amount lost during the pertinent timeframe. He explained that he used the 12-month period from 2004 as the basis because that 12-month period was a fair representation of the continuing expenses. He clarified that the 2004 numbers were a good indication of what the 2005 numbers should have been, provided there was not a hurricane.
 

 Ms. Lynn Mitchell, Lafayette’s expert accountant, testified that there were no officers’ salaries on the profit and loss statement for September or October but there were officers’ salaries for previous months prior to the hurricane. Thus, Ms. Mitchell recognized that historically, officers’ salaries had been paid before the hurricane. Consistent with that observation, she stated that if the money was owed to the officers at some later period, these salaries should be included.
 

 Ms. Mitchell thought it was problematic, however, that the profit and loss statements noted that the company was on an
 
 *34
 
 “accrual” rather than “cash” basis. If on an “accrual” basis, unlike a “cash” basis, this meant that the salaries had been paid and were no longer owed. She admitted, however, that even though the term 127“accrual” was used, the bakery might actually have been on a cash system. In sum, she testified that if the bakery owed the salaries, these would be continuing expenses. However, she would want to see payroll journals to determine they were actually owed.
 

 In contrast, Mr. Kase testified that the profit and loss statements indicated the officers were paid in December 2005. And, the reason the profit and loss statement did not list salaries in September was because of cash flow problems.
 

 Ms. Mitchell also disagreed with Mr. Ease’s use of the entire 2004 12-month period in calculating continuing expenses. Rather, she believed that the shorter period in 2005 before the hurricane (January through August 2005) should be the appropriate measure. She suggested that using the 2004 period, Mr. Kase inflated his figures.
 

 Mr. Kase, however, testified that there was no set formula for determining loss of business income. The use of a specific base period is a judgment call dependent upon the type of business. Therefore, two individuals performing a calculation could arrive at different figures. In Mr. Ease’s opinion, the 12-month 2004 period was more representative of the continuing expenses rather than the shorter 2005 period, although he did use the shorter period to calculate loss of net income, as did Ms. Mitchell.
 

 The insurance policy does not require a specific type of documentation, such as payroll records. The general purpose of business interruption insurance is to protect the earnings which the insured would have enjoyed had no interruption or suspension occurred.
 
 Yount v. Lafayette Ins. Co.,
 
 08-0380, p. 14 (La.App. 4 Cir. 1/28/09), 4 So.3d 162, 171. Mr. Fernandez testified that sales figures vary each month, with August and September being peak times. Therefore, the jury could have reasonably determined that Mr. Ease’s use of profit and loss statements and |2stax returns and consideration of the entire 2004 12-month period was appropriate to demonstrate the continuing expenses that would have occurred had there been no interruption of the business. Thus, we find no manifest error in the jury’s finding in that regard.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989).
 

 Moreover, as a general rule damages for loss of profits may not be based on speculation and conjecture; however, such damages need be proven only within reasonable certainty.
 
 Cox Communications v. Tommy Bowman Roofing, LLC,
 
 04-1666, p. 8 (La.App. 4 Cir. 3/15/06), 929 So.2d 161, 166-67, citing
 
 Lavigne v. J. Hofert Co.,
 
 431 So.2d 74, 77 (La.App. 1 Cir.1983). Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required.
 
 Id.,
 
 citing
 
 Louisiana Farms v. Louisiana Department of Wildlife and Fisheries,
 
 95-845, p. 36 (La.App. 3 Cir. 10/9/96), 685 So.2d 1086, 1105.
 

 Upon a careful review of the record, we cannot say that the jury’s factual findings that La Louisiane sustained a business income loss of $83,247 was manifestly erroneous or clearly wrong or that it abused its discretion in awarding that amount. The jury weighed the credibility of the experts and considered any alleged bias. An appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently.
 
 Detraz v. Lee,
 
 
 *35
 
 05-1263, p. 7 (La.1/17/07), 950 So.2d 557, 561. Further, credibility determinations, including evaluating expert witness testimony, are for the trier of fact.
 
 Id.,
 
 05-1263 at 11, 950 So.2d at 564 (citation omitted).
 

 Penalties and Damages
 

 At the heart of La Louisiane’s bad faith case is their argument that Lafayette failed to timely provide it with the undisputed portion of their claim, i.e. their adjuster’s recommendation that there was a “window” of opportunity for a ^business interruption claim. Lafayette argues that it acted reasonably to deny the plaintiffs claim for loss of business income on grounds that the loss was not caused exclusively by a covered clause of loss. It states that it relied on explicit policy language for the exclusion, the reports of two insurance adjusters who found evidence of flooding, and the insured’s acceptance of $70,000 in flood damage payments. Also, it argues that La Louisiane never submitted a satisfactory proof of loss with respect to the loss of a business income claim.
 

 La.R.S. 22:1220(A) provides that the insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured. It breaches that duty when it fails to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss when such failure is arbitrary, capricious, or without probable cause. La R.S. 22:1220(B)(5). As a result of that breach, the insured is entitled to damages and penalties. La.R.S. 22:1220(A) and (C).
 

 The determination that an insurer’s handling of a claim is arbitrary and capricious is a factual finding which may not be disturbed unless manifestly erroneous.
 
 Calogero v. Safeway Ins. Co. of Louisiana,
 
 99-1625, p. 5 (La.1/19/00), 753 So.2d 170, 173. An insurer’s actions are “arbitrary and capricious” when its willful refusal of a claim is not based on a good faith defense, or is unreasonable or without probable cause. But, where the insurer has legitimate doubts about coverage, the insurer has the right to litigate these questionable claims without being subjected to damages and penalties.
 
 Id.
 
 (citations omitted). However, an insurer must pay any undisputed amount over which reasonable minds could not differ.
 
 Louisiana Bag Co., Inc. v. Audubon Indem. Co.,
 
 08-0453, pp. 16-17 (La.12/2/08), 999 So.2d 1104, 1116.
 

 IsnOne who claims entitlement to penalties has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause.
 
 Reed v. State Farm Mut. Auto. Ins. Co.,
 
 03-0107, p. 13 (La.10/21/03), 857 So.2d 1012, 1020-21. It logically follows from this burden that a plaintiff who possesses information that would suffice as satisfactory proof of loss, but does not relay that information to the insurer is not entitled to a finding that the insurer was arbitrary or capricious.
 
 Id.
 
 It is well settled that a “satisfactory proof of loss” is only that which is “sufficient to fully apprise the insurer of the insured’s claims.”
 
 Louisiana Bag Co., Inc. v. Audubon Indem. Co.,
 
 08-0453, p. 23 (La.12/2/08), 999 So.2d 1104, 1119 quoting
 
 McDill v. Utica Mut. Ins. Co.,
 
 475 So.2d 1085, 1089. Proof of loss need not be in any formal style as long as the insurer receives sufficient information to act on the claim.
 
 Sevier v. U.S. Fid. & Guar. Co.,
 
 497 So.2d 1380, 1384 (La.1986).
 

 Ms. Wessel testified that Lafayette relied on the outside adjuster for information. Lafayette had notice through its adjuster in December 2005 that the adjuster concluded there was a “window” for a business interruption claim. Lafay
 
 *36
 
 ette also had notice through its adjuster that the computers sustained wind damage and that the roof and garage door were compromised. Mr. Fernandez called the insurer repeatedly over several months and the insurer took no action to either track the documents that Mr. Potter told Mr. Fernandez he received or to request further documentation from Mr. Fernandez. The insurer asked Mr. Fernandez to contact his agent, which he did. The agent told him that Lafayette had the documentation it needed.
 

 In this case, the jury, after hearing all the testimony and reviewing all the exhibits, determined the credibility of the witnesses and made a reasonable [31inference that Mr. Fernandez was given the “runaround.” That factual finding was supported by Ms. Wessel’s review of the log notes. Based on the record, the jury could have reasonably found that La Louisiane had, through its adjuster, submitted satisfactory proof of loss sufficient to fully apprise the insurer of the insured’s claims. We find no manifest error in that determination and in the determination that La Louisiane was entitled to damages and penalties for the insurer’s breach of its duty to adjust claims fairly and promptly and to make a reasonable effort to settle the claim.
 

 Request to Modify judgment
 

 In brief, La Louisiane asks this Court to modify the judgment. First, it seeks an increase in the jury award of damages and penalties under La.R.S. 22:1220. Second, it asserts that the jury erred by failing to award penalties under La.R.S. 22:658 as requested and it asks this Court to award attorney’s fees pursuant to La.R.S. 22:658. Third, citing La.C.C.P. art. 2164, La Louisiane asks this Court to use its discretion to amend the judgment to award attorney’s fees and costs at the trial court level. We note, however, that the trial court did award La Louisiane “all court costs, including juror’s lunch and for other costs to be determined by the trial court.” Therefore, the issue of costs at the trial court level is moot.
 

 More importantly, however, La Louisiane did not appeal the judgment or file an answer to the appeal. We cannot modify the judgment because to do so would result in a modification in favor of the non-appealing party, contrary to Louisiana law.
 
 Matthews v. Consolidated Companies, Inc.,
 
 95-1925, p. 1 (La.12/8/95), 664 So.2d 1191, 1191, citing La.C.C.P. art. 2133 among other cases therein.
 

 Request for Attorney’s Fees and Costs on Appeal
 

 Finally, La Louisiane seeks attorney’s fees and costs in connection with this appeal, relying on La.C.C.P. art. 2164. La Louisiane asserts that appellant has | S2filed a baseless appeal. Because La Louisiane has not appealed or answered the appeal seeking damages for a frivolous appeal, this claim is not before the Court.
 
 Dixon v. Bohn,
 
 04-503, p. 4 (La.App. 5 Cir. 11/30/04), 890 So.2d 613, 615-16.
 

 We note, however, that pursuant to La. C.C.P. art. 2164, an appellate court has the discretion to tax costs “of the lower or appellate court, or any part thereof, against any party to the suit, as ... may be considered equitable.” Exercising our discretion in this matter, we assess the costs on appeal incurred by La Louisiane to the appellant.
 

 Decree
 

 For the foregoing reasons, we affirm the judgment. The costs of this appeal are to be paid by Lafayette Insurance Company.
 

 AFFIRMED.
 

 [1]
 

 . Acts 2008, No. 415, Sec. 1, effective January 1, 2009, renumbered the entire insurance code without making substantive changes. The jury denied damages for La. R.S. 22:658. La.R.S. 22:658 was renumbered as La. R.S. 22:1892. La.R.S 22:1220 was renumbered as La. R.S. 22:1973.