BROWN, Chief Judge.
hThis is a medical malpractice action file by Caroline Glasscock[1], the widow of James Glasscock, against Louisiana State University Health Sciences Center (“LSUHSC”). After sustaining multiple injuries in a motorcycle accident on September 25, 2008, Mr. Glasscock was taken to LSUHSC. He underwent several surgeries and was placed in the Telemetry Unit. In the early morning hours of September 27, 2008, Mr. Glasscock suffered a fatal myocardial infarction and died.
After a trial, a jury found that the employees of LSUHSC did not breach the standard of care applicable to the treatment and care of Mr. Glasscock and judgment in accordance with the jury’s verdict was signed on December 23, 2013. Plaintiffs motion for JNOV/new trial was denied. Plaintiff has appealed. A peremptory exception of prescription filed in the appeal by defendant was referred to the merits of the appeal.[2] For the reasons set forth below, we affirm.

Facts

On September 25, 2008, 45-year old James Glasscock sustained multiple serious injuries in a motorcycle accident. Originally taken to the Springhill Medical Center in Spfinghill, Louisiana, he was transported to the LSUHSC in Shreveport, Louisiana. Upon his arrival around 9:34 p.m., Mr. Glasscock was taken to the trauma resuscitation bay and was evaluated [2by the trauma team, which included physicians in the medical specialty fields of orthopedic surgery, neurology and maxillo-facial surgery. Mr. Glasscock’s airway, breathing, circulation, neurological status, ability to move and understand what was being said were assessed, as were his external injuries.
Early on September 26, 2008, simultaneous with orthopedic surgery on his leg, Mr. Glasscock underwent facial surgery. Thereafter, he was taken to the Post Anesthesia Care Unit (“PACU”) before being placed in the Telemetry Unit. In this unit, a patient is attached to a monitoring unit with six lead wires which allow his heart rate and rhythm to be observed and continuously monitored by trained technicians *760 in a small room. There is a separate monitor for each patient, and patients in the Telemetry Unit receive a higher level of care as this unit is staffed with more nurses per patient than other areas of the hospital. Mr. Glasscock’s room was approximately 40 feet from the monitoring room.
Jennifer Allen Adams, R.N., was assigned to Mr. Glasscock’s room in the Telemetry Unit beginning at 7:00 p.m. on September 26, 2008. Nurse Adams completed an assessment of Mr. Glasscock at 7:10 p.m. At 8:20 p.m. Mr. Glasscock was taken to Radiology for a CT scan of Ms leg. He was returned to his room at 8:40 p.m. Nurse Adams monitored Mr. Glas-scock’s status throughout the evening of September 26 and the early morning hours of September 27. At 2:27 a.m. on September 27, the telemetry tech called Nurse Adams and had her check Mr. Glasscock’s leads. When the nurse went into Mr. Glasscock’s room, she found' him | .¡unresponsive. A code team arrived at 2:29 a.m. and began CPR. Atropine and epinephrine were administered, and Mr. Glasscock’s heart was able to -be shocked back to a fast but normal sinus tach rhythm, but because his heart rhythm deteriorated back to asystole, or a flatline, Mr. Glasscock was pronounced dead at 2:50 a.m. on September 27, 2008.
On September 28, 2009, plaintiff initiated this action by filing a request, with the Louisiana Division of Administration for the formation of a medical review panel. The medical review panel’s opinion was rendered on July 19, 2011, and plaintiffs survival action/wrongful death claim was-filed in district court on November 21, 2011. Trial was held before a jury December 9-12, 2018; nine of the 12 jurors found that the conduct of LSUHSC, through a nurse or other staff member, did not breach the applicable standard of care in the treatment or care of James Glasscock. Judgment in accordance with the jury’s verdict was signed on December 23, 2013. A motion for JNOV/new trial was denied by the trial court in judgments signed on May 28, 2014, and June 16, 2014.[3] On appeal, plaintiff has assigned several errors directed at whether the jury was manifestly erroneous in its factual findings and one addressing the trial court’s decision not to give a requested jury instruction.

14Discussion

Requested Jury Instruction — Adverse Presumption/“Úncalled Witness” Rule
At the end of defendant’s case, plaintiffs counsel requested that a special jury instruction be given that applied an adverse presumption to the fact that defendant failed to call as witnesses Cynthia Smith, the telemetry technician on duty when Mr. Glasscock coded, and Dr. Katie Walton, the resident who filled out the code note at Mr. Glasscock’s death. The trial court declined to give such an instruction but allowed plaintiffs counsel to include this information in his closing argument.
An adverse presumption exists when a party having control of a favorable witness fails to call him or her to testify, even though the presumption is rebuttable and is tempered by the fact that a party need only put on enough evidence to prove the case. Driscoll v. Stucker, 04-0589 (La.01/19/05), 893 So.2d 32; Ollis v. Miller, 39,087 (La.App.2d Cir.10/29/04), 886 So.2d 1199. Whether to apply such an inference *761 is fully within the discretion of the trial court. Moretco, Inc. v. Plaquemines Parish Council, 12-0430 (La.App. 4th Cir.03/06/13), 112 So.3d 287, writ denied, 13-0724 (La.05/17/13), 118 So.3d 376; Roth v. New Hotel Monteleone, L.L.C., 07-0549 (La.App. 4th Cir.01/30/08), 978 So.2d 1008.
As noted by the court in Moretco, Inc., supra at 296-7, Louisiana courts have held that the trial judge’s decision not to apply the negative inference is not an abuse of discretion under any one of these circumstances: |fiwhere the witness’s testimony would be cumulative;[4] where the party seeking to avail itself of the negative inference has the burden of proof on the issue that would be addressed by the witness’s testimony;[5] and where the witness is equally available to the opposing party.[6]
We find no abuse of the trial judge’s discretion in the instant case. As former employees of LSUHSC, Dr. Walton and Ms. Smith were no longer under defendant’s control for purposes of the uncalled witness rule. See Roth, supra; Laborde v. St. James Place Apartments, 05-0007 (La.App. 1st Cir.02/15/06), 928 So.2d 643. Furthermore, the record reflects that both parties had the opportunity during the discovery process to depose these witnesses, something which apparently was not done by either party. While Dr. Walton was subpoenaed by defendant, LSUHSC was not required to call all persons listed on its witness list. The decision not to call Dr. Walton to testify was apparently a tactical one made by defense counsel, just as the decision not to depose or subpoena either Dr. Walton or Cynthia Smith was by plaintiff’s counsel. The burden of proof in this malpractice case remained on plaintiff, who cannot, by application of the adverse presumption rule, accomplish a shift of the burden to defendant to prove that malpractice did not occur. See Randolph, supra.
| ¿Manifest ■ Error/Reasonable Factual Basis for Verdict
Plaintiffs remaining assignments of error urge that the jury was manifestly erroneous in failing to find that Mr. Glas-scock’s death was caused by negligence in his care and treatment by LSUHSC employees. Specifically, plaintiff asserts that the jury erred in failing to find negligence based on evidence that the telemetry leads were-not connected and expert testimony that failure to connect the leads was a breach of the applicable standard of care. Alternatively, plaintiff contends that if the jury concluded that the telemetry leads were on, it was nonetheless clearly wrong in failing to find negligence based on evidence that the tech monitoring the unit did not timely observe Mr. Glasscock’s rhythmic disturbances.
Appellate review of the trier of fact’s findings in' a medical malpractice action is limited. Farmer v. Willis Knighton Medical Center, 47,530 (La.App.2d Cir.11/14/12), 109 So.3d 15, writs denied, 12-2698 (La.02/18/13), 108 So.3d 89, 13-0346 (La.04/01/13), 110 So.3d 586; Prine v. Bailey, 45,815 (La.App.2d Cir.12/15/10), 56 So.3d 330. If the record, when read in its entirety, supports the fact finder’s conclu *762 sions and those conclusions are reasonable, an appellate court cannot reverse or modify the trial court’s judgment based on those factual conclusions. An appellate court can only reverse a fact finder’s determinations when it finds from the record that a reasonable factual basis does not exist for the findings of the trier of fact, and it further determines that the record establishes that the findings are manifestly erroneous. Farmer, supra; Lovelace v. Giddens, 31,493 (La.App.2d Cir.02/24/99), 740 So.2d 652, writ denied, 99-2660 (La.11/24/99), 750 So.2d 987.
 When expert opinions contradict concerning compliance with the applicable standard of care, the trier of fact’s conclusions will be granted great deference. Richardson v. Christus Schumpert Health System, 47,776 (La.App.2d Cir.02/27/18), 110 So.3d 264, writ denied 13-0621 (La.04/19/13), 112 So.3d 228; Hays v. Christus Schumpert Northern La., 46,408 (La.App.2d Cir.09/21/11), 72 So.3d 955. It is within the province of the fact finder to evaluate the credibility of such experts and their testimony. Farmer, supra; Turner v. Stassi, 33,022 (La.App.2d Cir.05/10/00), 759 So.2d 299.
A medical malpractice claimant must establish by a preponderance of the evidence: (1) the defendant’s standard of care, (2) the defendant’s breach of that standard of care, and (3) a causal connection between the breach and the claimant’s injuries. La. R.S. 9:2794(A); Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228; Farmer, supra; Bamburg v. St. Francis Medical Center, 45,024 (La.App.2d Cir.01/27/10), 30 So.3d 1071, writ denied, 10-0458 (La.04/30/10), 34 So.3d 294. Hospitals are bound to exercise the requisite amount of care toward a patient that the particular patient’s condition may require. Richardson, supra. The mere fact that an injury occurs or an accident happens raises no presumption or inference of negligence on the part of the hospital. Galloway v. Baton Rouge General Hospital, 602 So.2d 1003 (La.1992); Crockham v. Thompson, 47,505 (La.App.2d Cir.11/14/12), 107 So.3d 719. Instead, a|sdetermination of whether a hospital has breached the duties owed to a patient depends on the facts and circumstances of each particular case. Richardson, supra; Gordon v. Willis Knighton Medical Center, 27,044 (La.App.2d Cir.06/21/95), 661 So.2d 991, writs denied, 95-2776, 95-2783 (La.01/26/96), 666 So.2d 679.
It is well settled that a hospital is liable for its employee’s negligence, including doctors and nurses, under the re-spondeat superior doctrine. Farmer, supra; Benefield v. Sibley, 43,317 (La.App.2d Cir.07/09/08), 988 So.2d 279, writs denied, 08-2162, 08-2210, 08-2247 (La.11/12/08), 996 So.2d 1107, 1108. Nurses who perform medical services are subject to the same standards of care and liability as are physicians. Id. The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, along with his or her best judgment in the application of his or her skill to the case. Richardson, supra; Farmer, supra; Little v. Pou, 42,872 (La.App.2d Cir.01/30/08), 975 So.2d 666, writ denied, 08-0806 (La.06/06/08), 983 So.2d 920.
Neither party called the physician who wrote the code note or the telemetry technician who was on duty at the time that Mr. Glasscock died. Both of these were no longer employed with LSUHSC at the time of trial. The deposition video of Nurse Jennifer Allen Adams was played for the jury, however, and Lottie Gardner, *763 the telemetry tech who had worked the 7 a.m.-7 p.m. shift on September 26, 2008, was called by defendant to testify. Both parties presented the testimony of several medical experts.
|9Plaintiff, Carolyn Glasscock, who was with her husband in his room while he was on the Telemetry Unit, testified. The only testimony by Mrs. Glasscock related to the issue of the telemetry leads and the care provided by the Telemetry Unit staff was that she remembered the nurse giving Mr. Glasscock Benadryl around midnight, but she “did not know” anything about the leads. Mrs. Glasscock testified that she fell asleep around 12:30 a.m. The Glas-scocks’ daughter-in-law, Tammy Miller, was also in Mr. Glasscock’s room while he was on the Telemetry Unit. She did not testify at trial, however.
Nurse Jennifer Allen Adams stated that she is currently employed at Enloe Medical Center in Chico, California. Before that, she worked at LSUHSC in the Telemetry Unit beginning in July 2008 for about 15-16 months until she moved back to California.
Nurse Adams testified that she has reviewed the LSUHSC records of Mr. Glas-scock, particularly the nurses’ notes. She stated that her shift on September 26, 2008, was 7 p.m. to 7 a.m. The record shows that she checked on Mr. Glasscock to assess his pain level/tolerance at 7.T0 p.m., 10:20 p.m. and midnight.
When Mr. Glasscock went from Telemetry to Radiology, he could not be monitored by the telemetry techs so an RN had to go with him; she accompanied Mr. Glas-scock on his transport to Radiology. According to Nurse Adams, Mr. Glasscock’s leads should have been disconnected before the transport to Radiology, but they may have been disconnected while he was down in Radiology. Either way Mr. Glas-scock would not be able to be 110monitored because he was off of the telemetry floor. The nurses’ notes show that Mr. Glasscock was returned to the Telemetry Unit from Radiology at 8:40 p.m.
Nurse Adams testified that she does not have a specific recollection of reconnecting Mr. Glasscock to the telemetry box/leads when he came back from Radiology. Nurse Adams reiterated that when a patient is on a Telemetry Unit, he or she must be continuously monitored. Nurse Adams testified that if she did not go in and specifically hook the patient back up when the patient came back from somewhere like Radiology, the tech would be alerted that the leads were off, and she would request that the patient be hooked back up if the nurse had not already done so. Nurse Adams noted that if the leads are off, there will be an indication on the monitor in the telemetry room.
Regarding her practice in checking on her patients and filling in notes: Nurse Adams testified that she makes sure that patient is in sinus rhythm. She does this by visually inspecting the screen in the telemetry room or calling the telemetry tech for that information. In September 2008, Nurse Adams testified that it was her practice to do this at least twice a shift for each patient.
The nurses’ notes show that Nurse Adams was in Mr. Glasscock’s room at 10:00 p.m. for blood glucose check and again at 11:10 p.m. when she informed Dr. Haydel that Mr. Glasscock’s glucose was elevated. At midnight, she gave Mr. Glas-scock his routine meds and 50 mg of Bena-dryl via IV for itching.
| uNurse Adams stated that there are usually little lights on the telemetry box which indicate when a lead has popped off and usually this can be seen under the patient’s hospital gown. It was common for leads to come off; Nurse Adams testi *764 fied that they can come off just by movement. It is not her practice to note or document every time a lead pops off or is put back on. It was not LSU’s practice or requirement that this be done either.
. The nurses’ notes show that,at 2:27 a.m. Nurse Adams, found Mr. Glasscock unresponsive. She went into his room because the telemetry tech called her and told her to check his leads. At that time, Nurse Adams called a code blue, which initiated the .code team, who quickly responded with the crash cart to start CPR.
On cross-examination, Nurse Adams testified that it is the nurse’s responsibility to make sure that the telemetry leads are on the patient and hooked up to the monitor. She reiterated that the last documented time she checked on Mr. Glasscock prior to 2:27 a.m. was midnight.
Nurse Adams stated that it was her practice, especially because she was a new nurse at that time, to check on her patients every, hour. One way she did this was by looking into their rooms to make sure she saw the rise and fall of their chests. Nurse Adams testified that she usually noted a patient’s heart rhythm two times per shift.
When the telemetry tech asked her to check on Mr. Glasscock at 2:27 a.m., the technician didn’t say there was a problem with his heart rhythm, but with the leads. It is absolutely not possible that the leads had been off for a long period of time because if they had, the monitor screen would have |12been blank with a straight line running across it. The tech would have noticed the patient not on telemetry and had Nurse Adams remedy the problem. Nurse' Adams was certain that' Mr. Glasscock was not on the Telemetry Unit without being hooked up from the time they came back from his CT scan until 2:30 in the morning. However, Mr. Glas-scock could have gone into cardiac arrest and knocked off his leads just prior to the tech letting her know that the leads needed to be checked.
On redirect exam, Nurse Adams emphasized that Mr. Glasscock was a telemetry patient who was on that floor specifically to have his heart monitored. If the leads had been off, the nurse would have noticed when she went in to check the lights on the telemetry box. If Nurse Adams did not find leads which were unattached, the telemetry tech would notice the blank screen and let the nurse know to reattach them. Nurse Adams repeated that it is her practice when checking on patients to determine that IVs, catheters, and telemetry units are working properly.
Lottie Gardner testified that she has worked at LSUHSC as a telemetry technician for 25 years. Ms. Gardner stated that she was not working when Mr. Glasscock coded; she worked the. previous shift, the 7 a.m.-7 p.m. shift, on September 26, 2008, and participated in Mr. Glasscock’s care during her shift.
Ms. Gardner demonstrated for the jury a telemetry monitor similar to the one Mr. Glasscock had been hooked up to and explained that for every patient in the. Telemetry Unit, there is a monitor. Part of her job as a telemetry technician is to look at the monitors to detect' any issues with heart | isrates and rhythms. According to Ms. Gardner, rhythm strips are run at the beginning of each shift, at 6:30 a.m. and 6:30 p.m., and in the middle of each shift, at approximately 3 a.m. and 3 p.m. Before Mr. Glasscock coded, the, last strip was run before shift change at 6:30 p.m.; another strip was due to be run at' 3 a.m.
Ms. Gardner stated that it is common for patients to knock off their leads and that connection/reconnection was the duty of the nurses and technicians. According to Ms. Gardner, there is someone looking *765 at the monitors around the clock; if a tech has to take a break, a nurse comes in and watches the monitors until the tech returns from break.
Their procedure is to look for a rhythm change. If there is one, the tech notifies the nurse, who is responsible for notifying the doctor. Ms. Gardner testified that if there is a lead off, the monitor says “lead off.” The tech will call the nurse to go into the patient’s room, check the monitor and put the lead or leads back on the patient.
On cross-examination, Ms. Gardner stated that if a patient is in cardiac arrest and asystole, the techs can see that on the monitor. At that time, a tech should hit the button on the monitor and print a strip showing that abnormality.
According to Ms. Gardner, most of the time when a person goes into asystole, a code is called. A code team responds quickly, moving in with the crash cart and the team who responds takes the- patient off the telemetry monitor. If a patient has an arrhythmia or another rhythm change such as v-fib, it will show upon the monitor and the tech should print the strip. This | i4does not always happen, however, because of the time constraints involved in responding to a code situation.
Dr. Trip Edwards, who is currently serving as the Medical Director of the Emergency Department at Willis Knigh-ton Pierremont, was one of the three physicians who served on the medical review panel. Dr. Edwards testified that all three doctors on the panel found no violations of any medical standard and no malpractice on the part of any of the doctors, nurses or other personnel regarding the care and treatment provided to Mr. Glasscock. However, the panel was “unclear as to what was meant by the statement in the code note [written by Dr. Walton] that the patient’s leads were off.” Thus, the panel found a material issue of fact bearing on liability for consideration by the fact finder. Dr. Edwards observed that the code note was written by a docto'r, a third party, who- was reporting that someone told the nurse that the leads were not on and the nurse went to ’check on Mr. Glasscock, finding him unresponsive.
There is no direct evidence in the medical récord that the leads were attached to Mr. Glasscock at 7:30 a.m. when he got to the Telemetry Unit. There is also no direct evidence in the medical record that the nurse reattached the leads when Mr. Glasscock came back from Radiology at 8:40 p.m. According to Dr. Edwards, it is not customary, i.e. the standard of care, for nurses to record or write down when they reattach telemetry leads. His experience is more often than not that the nurses never write these tasks down. However, Dr. Edwards testified that just because someone did not write something down does not mean it did or did not happen.
| ifjThe code death note written by. Dr. Walton stated that the patient’s nurse was •notified that the patient’s leads were not on and went to the bedside; Because from the record it is impossible to tell from a medical standpoint whether the leads were on or off, there are three scenarios, all of which are possible. First, if. the leads were on, the cardiac arrest should have been noticed. Second, if the leads were off, they should have been put back on. Third, it is equally possible that what the telemetry tech saw was either that Mr. Glasscock went into asystole or the leads suddenly came off, so the tech called the nurse, who went in to check and initiated the code and CPR process.
Plaintiffs expert, Dr. Walter Simmons, was qualified as an expert in Public Health, Emergency Medicine and Errors & Omissions in the delivery of health care. *766 He reviewed the LSUHSC medical records regarding the treatment and care of Mr. Glasscock as well as the medical review panel’s opinion. Dr. Simmons’ opinion was that Mr. Glasscock was a victim of medical malpractice while at LSUHSC. According to Dr. Simmons, the malpractice of the staff of LSUHSC was a contributing factor in Mr. Glasscock’s death.
Dr. Simmons observed that at 8:20 p.m. Mr. Glasscock was transported to Radiology for a CT scan and returned to the Telemetry Unit at 8:40 p.m. The record contains no statement that the leads were reconnected upon Mr. Glasscock’s return to the unit at 8:40 p.m.
According to Dr. Simmons, it was medical malpractice for the nurse to fail to reconnect the leads when Mr. Glasscock returned from Radiology |1fiat 8:40 p.m. because he was deprived of the continuous heart function monitoring he was to be receiving. There are no notations or rhythm strips in Mr. Glasscock’s medical record for the approximately six hours from 8:40 p.m. to 2:27 a.m. to document that a tech or nurse did an evaluation or assessment of Mr. Glasscock’s cardiac status, which is what the telemetry staff was supposed to be doing. The record shows that the last time anyone checked on Mr. Glasscock was Nurse Adams at midnight.
Dr. Simmons next addressed the code note written by Dr. Walton, who wrote that [she was] “notified that patient’s leads were not on and [nurse] went to bedside. Found patient unresponsive and CPR was initiated.” According to Dr. Simmons, CPR is not initiated unless a pulse cannot be determined.
There is no entry in the record to indicate that anyone picked up a cardiac problem or anomaly with Mr. Glasscock until he was already dead. Had the telemetry tech been doing her job, which was to monitor Mr. Glasscock, more probably than not, some time between midnight and 2:27 a.m., there would have been a rhythm disturbance called an arrhythmia which should have been detected by the tech and reported to the nurse, who then would have been obligated to immediately assess the patient and institute appropriate intervention.
Dr. Simmons also testified that there was one other opportunity that Mr. Glas-scock’s life could have been saved, which was a proper follow up on his elevated blood sugar by Nurse Adams. However, this testimony was based on the witness’s erroneous assumption that insulin was being 117administered to Mr. Glasscock by IV; as others testified, the record shows that the patient was actually receiving it subcutaneously. On cross-examination, Dr. Simmons acknowledged that with subcutaneous administration, the insulin is absorbed at a slower rate and remains in the system longer than it does if administered by IV. He also conceded that the doctor’s orders were for Nurse Adams to check on Mr. Glasscock’s glucose levels every four to six hours.
Dr. Simmons stated that he cannot tell what is done by a nurse if it is not documented or written down in the record. Accordingly, his assumption that the leads were not connected during the period from 8:40 p.m. until 2:27 a.m. is based on the lack of documentation in the record and the lack of rhythm strip printouts from the Telemetry Unit monitoring Mr. Glas-scock’s heart function for that time period.
Dr. Mallory Williams testified that in 2008, he was the assistant director of the LSUHSC Trauma Center. Dr. Williams, an expert in Trauma Critical Care and General Surgery, discussed Mr. Glas-scock’s prior medical history, which included high blood pressure, uncontrolled diabetes, sleep apnea, asthma, a fatty liver and *767 pancreas (due to obesity), and thoracic spinal height degeneration. Mr. Glasscock’s initial chest x-ray and the autopsy also revealed that he had a markedly enlarged heart. According to Dr. Williams, systemic diseases such as these negatively impact the body’s ability to survive post-surgery. Furthermore, the ability of a body to withstand a trauma such as a motorcycle accident depends on what state the body is in before such a trauma.
11RAccording to Dr. Williams, Mr. Glas-scock’s chronic illnesses complicated his ability to survive or be rehabilitated normally from his injuries. Dr. Williams testified that Mr. Glasscock’s transfer to the Telemetry Unit was with the intent that he would have further surgery on his leg at LSUHSC once he was stable enough.
While the record, in particular the nurse’s notes, do not contain entries documenting specific tasks performed by Nurse Adams during her 7 p.m. to 7 a.m. shift on the Telemetry Unit, Dr. Williams stated that he would expect that she checked whether the leads were on every time she went into Mr. Glasscock’s room. The record shows that Nurse Adams was in Mr. Glasscock’s room at 8 p.m. when she administered morphine, at 11:10 p.m. when she gave him insulin, and at midnight when she gave him Benadryl. According to Dr. Williams, Nurse Adams did not breach the standard of care by not checking Mr. Glasscock’s glucose at midnight-after she gave it subcutaneously at 11:10 p.m., it wasn’t due to be checked again for another four hours.
Dr. Williams further testified that it is not common practice for a nurse to document when leads on a patient in the Telemetry Unit are reattached. A nurse is not expected to document whether leads are on or off.
Dr. Williams explained the sequence of events once the code team responded. At 2:20 a.m. a code blue was called because Mr. Glasscock had no obtainable blood pressure and no pulse. He was not breathing and his |1flrhythm was asystole, which means no rhythm. This is commonly referred to as a “flatline.”
At 2:42 a.m. after CPR, Mr. Glasscock still had no blood pressure, but his pulse was 32. This is bradycardia, which is a slow heart rate. His heart was in a non-coordinated rhythm called ventricular fibrillation or “v-fib.” He was still not breathing independently.
At 2:46 a.m., Mr. Glasscock’s pulse was 110 and he was still not breathing independently, but his heart rate was moving along. Dr. Williams stated that Mr. Glas-scock was in sinus tachycardia which is a normal rhythm.
During this process, Mr. Glasscock was given atropine and epinephrine and shocked or defibrillated several times. The heart rhythms during the CPR process are measured by active leads on the patient’s chest during the time of intervention — these are the same five colored leads used by the Telemetry Unit to monitor the patient’s heart rhythm and function while he is on the unit. The EKG lead reading was going on at the same time the code team was doing CPR.
At 2:47 a.m., Mr. Glasscock’s pulse was 38, he was not breathing independently, and his rhythm had deteriorated from a coordinated rhythm of sinus tach to one of noncoordinated v-fib.
At 2:50 a.m. there was further deterioration of Mr. Glasscock’s heart rhythm from v-fib to flatline or asystole. Dr. Williams emphatically testified that if a heart has been in asystole for five or more minutes, [ ¡^responders cannot get a coordinated or uncoordinated rhythm back because in as-ystole there is no blood flow.
*768 According to Dr. Williams, it is impossible for a person to go from asystole to v-fib if he has been in cardiac arrest for more than a few minutes. The heart is the first organ to lose blood flow and without blood, cells called cardiac myocytes start dying. These cells -are not regenerative and without them, there is no muscle function in the heart. The code team reported that Mr. Glasscock’s heart rhythm improved from 2:29 to 2:46 a.m. then deteriorated back down into asystole. Dr. Williams testified that what this means is that at 2:29 a.m., Mr. Glasscock had been in asystole for five minutes or less. There is no way he had a 'rhythm for a longer period of time because- he could not have gone from asystole to v-fib to sinus tachycardia as he did when the code team first administered atropine and epinephrine.
According to Dr. Williams, Mr. Glas-scock’s death was a culmination of the multiple injures he suffered at the time of trauma (the motorcycle wreck), together with systemic diseases that preceded the wreck. These two things came together and' caused Mr. Glasscock’s death.
While on cross-examination, Dr. Williams stated that from the fact that Dr. Walton wrote the code note he can assume that she was one of the responding doctors. Dr. Walton was a surgery resident; she documented a set of circumstances she believed to be true as she wrote her note. He doesn’t know the source of Dr. Wal: ton’s information because the note doesn’t say.
|aiDr. Williams ■ testified- that telemetry units do not prevent events from occurring; they speed up the detection of these events. Telemetry units do not- ‘ detect medical abnormalities, they can only measure rate and rhythm abnormalities which must be interpreted and if needed, addressed by a health care professional.
Dr. Williams stated that when a printout or monitor notifies the telemetry tech that there are lead problems or unattached leads, the applicable medical standards require the tech to notify the nurse, who has a duty to-immediately check the patient’s leads.
According to Dr. Williams, it would be unusual for, all of a sudden, at 2:27 a.m., all five of Mr. Glasscock’s leads to get disconnected. Dr. Williams opined that such an occurrence would be highly improbable considering the immobile state of the patient.
Dr.' Williams opined, with a reasonable degree of medical certainty, that Mr. Glas-scock had not been in asystole for longer than five minutes when the code occurred. He further testified that it is highly or extremely unlikely that Mr. Glasscock had been in an arrhythmia or had a heart rate disturbance for minutes or hours preceding the code. During his stay at LSUHSC there was constant telemetry monitoring of Mr. Glasscock, not just while he was on the Telemetry Unit. While he was in the operating -room, Mr. Glasscock suffered the greatest stress while his leg was being manipulated. He had no arrhythmia whatsoever during the entirety of the surgery.
1220n redirect, Dr. Williams testified that he does not believe that Mr. Glasscock had arrhythmia. Instead, Dr. Williams opined that Mr. Glasscock probably had a fatal myocardial infarction or heart attack. Dr. Williams referred to Mr. Glasscock’s long history of high blood pressure, enlarged heart, and diabetes, which, according to Dr. Williams is correlative with heart disease. Mr. Glasscock was 68" tall and weighed 317 pounds. Most likely, a postoperative myocardial infarction, together with his other chronic conditions and injuries, caused Mr. Glasscock’s death.
Dr. Williams reiterated that he can tell with medical certainty that Mr. Glasscock’s *769 heart stopped less than five minutes before 2:29 a.m. According to Dr. Williams, the time frame could have been less, but definitely was not any longer than five minutes before the code was called; a person cannot come back from asystole after a longer period of time because of the heart’s sensitivity to a lack of blood flow.
Dr. Williams looked at telemetry strips and rhythms from Mr. Glasscock’s admission for anything to suggest that he had a heart that was arrhythmic. The anesthesia flow sheet from the time that Mr. Glasscock was in surgery under maximum stress under general anesthesia all the way through the end of surgery, including extu-bation, showed that Mr. Glasscock was in a sinus tachycardia or normal rhythm the entire time. This same pattern showing sinus tachycardia was noted on strips from the time that Mr. Glasscock was in the Telemetry Unit.
Addressing Mr. Glasscock’s high glucose levels, Dr. Williams testified that when a diabetic undergoes physiological stress, such as an ^infection or surgery, their blood sugars become hard to control.While Mr. Glasscock’s glucose numbers were high, they were not in the deadly range, which is somewhere north of 750-800.
If Nurse Adams testified that it was her practice every time she checked a patient in the Telemetry Unit she checked their IVs and their leads, this practice would not be a breach of the standard of care; instead, it is actually consistent with the standard of care. Dr. Williams noted that the best evidence of what Nurse Adams did is her testimony.
Dr. Joseph Litner has practiced in the field of emergency medicine since the early 1980’s. He is currently a staff physician at the Madigan Army Medical Center at Ft. Lewis, which is south of Seattle-Taeo-ma, Washington. Dr. Litner taught classes in Advanced Cardiac Life Support, Advanced Trauma Life Support at Tulane and LSU Medical Centers and' currently teaches Emergency Medicine at University of Washington Medical School. - To prepare for his testimony, Dr. Litner stated that he reviewed the medical records from LSUHSC and Mr. Glasscock’s autopsy report. Dr. Litner observed that Mr. Glas-scock had systemic diseases such as diabetes and high blood pressure, as well as bad kidneys, an enlarged heart, bad lungs, and a fatty liver and pancreas. According to Dr. Litner, such a patient does not do as well after trauma and surgery as a patient without those problems. Dr. Litner agreed with the autopsy report statement that Mr.' Glasscock died of multiple injuries.
Dr. Litner also agreed with Dr. Williams that a person in v-fib can be revived and that one in asystole can only be revived if he can first be gotten l^to a v-fib rhythm by the administration of drugs such as. atropine and epinephrine which quickly irritate the heart’s fibers into pumping more efficiently.
According to Dr. Litner, in his almost 35 years of practice in emergency medicine, the only time that someone who is in asys-tole can be saved is if he has only been in asystole for a few minutes. If a patient, spends more than five minutes in asystole, he or she can not be resuscitated.
Dr. Litner was certain that there is absolutely no way that Mr. Glasscock’s heart stopped for more than a few minutes before 2:29 a.m,; at the very most, the time he was in asystole was five minutes. Otherwise, the code team would have been unable to get his rhythm to v-fib and to a fast sinus tachycardia from that asystolic rhythm.
According to Dr. Litner, the care rendered to Mr. Glasscock beginning at 7 p.m. *770 on Sept. 26, 2008, until he coded was appropriate. There was no breach of the standard of care by the nurses or staff during that time. The lack of notation at 8:40 p.m. that Mr. Glasscock was hooked back up to telemetry was not a breach of the standard of care. It is such a routine task, it is not often noted in patient’s records.
Dr. Litner opined that it is inconceivable that a nurse such as Nurse Adams, who checked on a patient three or four times for glucose cheeks, insulin administration, and to give routine meds and Benadryl, would not check to see that the patient’s leads were properly attached each time.
We find that the jury was presented with reasonable evidence from which they could have concluded that the telemetry leads were connected to l25Mr. Glasscock upon his return from Radiology and that one or two leads popped off at or immediately before 2:27 a.m. on September 27, 2008, when the telemetry tech told Nurse Adams to check on Mr. Glasscock because there was a problem with his leads. Likewise, we find no manifest error in this conclusion by the jury.
While Nurse Jennifer Adams did not have a specific recollection of reconnecting Mr. Glasscock’s leads upon his return from Radiology, it was her practice to make sure to reconnect a patient upon his or her return to the telemetry floor. However, if she had not yet done so, the technician would be alerted and notify the nurse to reconnect the leads.
Drs. Edwards, Williams, and Litner testified that the care rendered by the Telemetry Unit staff from 7 p.m. on September 26, 2008', until Mr. Glasscock coded was appropriate, and there was no breach of the applicable standard of care by the nurses or other staff during that time, including the lack of documentation regarding the attachment and reattachment of Mr. Glasscock’s leads.
We further find that a reasonable evi-dentiary basis exists for the jury’s rejection of plaintiffs alternate theory that, if the telemetry leads were properly connected, the staff in the Telemetry Unit was negligent because they failed to recognize disturbances in Mr. Glasscock’s heart rhythm and to timely respond to these abnormal rhythms. Likewise, our reviewing the record leads us to find no manifest error in the jury’s determination.
Dr. Williams testified that he did not believe that Mr. Glasscock’s heart had ar-rythmias prior to his death. On cross-examination, Dr. Williams Instated that it was highly unlikely that Mr. Glasscock had an arrhythmia or heart disturbance for minutes or hours before he died. According to Dr. Williams, the biggest time of risk for Mr. Glasscock in which he could have had arrhythmias or rhythm disturbances would have been when he was extu-bated after surgery, approximately 22 hours prior to his cardiac arrest. Dr. Williams reviewed the medical records and showed the jury that during surgery, Mr. Glasscock’s heart rhythm, while slightly elevated, was a normal sinus tachycardia. Dr. Williams also explained that Mr. Glas-scock’s rhythm was sinus tachycardia upon his discharge from the PACU. Finally, Dr. Williams examined Mr. Glasscock’s strips from his time in the Telemetry Unit and pointed out that there were no ar-rhythmias shown during that time period. Dr. Williams stated that he did not believe that Mr. Glasscock had any rhythm disturbances prior to 2:27 a.m.
Dr. Williams testified that Mr. Glasscock suffered a fatal myocardial infarction a few minutes before 2:29 a.m. Both Drs. Williams and Litner believed that Mr. Glasscock’s heart stopped around the time that Nurse Adams was told by the teleme *771 try tech to check on his leads. From the CPR record, Dr. Williams showed that the code team found Mr. Glasscock’s heart rhythm to be at asystole at 2:29 a.m., and that after CPR was started and atropine and epinephrine were administered, his heart rhythm went to ventricular fibrillation at 2:42 a.m. To a medical certainty, Dr. Williams stated that Mr. Glasscock’s heart had stopped for less than five minutes prior to 2:29 a.m. Dr. Litner also testified that, since the code team was able to get Mr. Glasscock’s heart rhythm from asystole at 2:29 a.m. to v-fib at|¿j2:42 a.m., then to sinus tachycardia, Mr. Glasscock’s heart had stopped only a few minutes before 2:29 a.m.
It was reasonable for the jury to credit the testimony of Drs. Williams and Litner that Mr. Glasscock’s heart stopped only a few minutes before 2:29 a.m. on September 27, 2008, around the same time that Nurse Adams found him unresponsive when she checked on him upon request of the telemetry technician; that Mr. Glasscock had no prior arrhythmias; and that this was the first cardiac event Mr. Glasscock suffered during his hospitalization at LSUHSC.
The jury implicitly chose the opinions of Drs. Edwards, Williams, and Litner over the testimony of Dr. Simmons both as to whether the leads were properly connected to Mr. Glasscock and whether there were any rhythm anomalies shown on Mr. Glas-scock’s telemetry unit to which the staff failed to timely respond. As noted above, great deference is given to the jury’s determination to credit the testimony of one set of experts over the opinion expressed by another. Farmer, supra; Crockham, supra. The jury’s findings are not manifestly erroneous and will not be disturbed by this court.

Judicial Confession

Plaintiff also contends that the jury erred in failing to follow the trial court’s jury instruction regarding plaintiffs judicial confession concerning the timing of Mr. Glasscock’s brain injuries. According to plaintiff, had the jury given this instruction proper consideration, it would have concluded that Mr. Glasscock sustained a brain injury during his hospitalization, that this injury was caused by negligence on the part of defendant, and that this |2sinjury was a substantial factor in causing Mr. Glasscock’s death. Defendant notes the complete lack of evidence or testimony to support this theory, and urges that the jury was reasonable in rejecting plaintiffs theory that a second brain/head injury not recorded in Mr. Glasscock’s medical records occurred and was the precipitating cause of the cardiac arrest that took Mr. Glasscock’s life.
A judicial confession is a declaration made by a party during a judicial proceeding. La. C.C. art. 1853; Johnson v. Johnson, 49,500 (La.App.2d Cir.01/14/15), 161 So.3d 1002, writ denied, 15-0320 (La.04/24/15), 169 So.3d 359; Anderson v. Houston, 44,766 (La.App.2d Cir.09/23/09), 22 So.3d 1029. A declaration that expressly acknowledges an adverse fact and is made by a party in a judicial proceeding is a judicial confession that constitutes full proof against the party who made it. Johnson, supra; La Louisiane Bakery Co., Ltd. v. Lafayette Ins. Co., 09-825 (La.App. 5th Cir.02/08/11), 61 So.3d 17, writ denied, 11-0493 (La.04/25/11), 62 So.3d 95. In a civil jury trial, where the jury is the judge of the facts as well as the law, it is the function of the court to properly charge the jury as to the applicable law, and the jury must accept and apply the law as given by the trial court. Presley v. Upper Mississippi Towing Corp., 141 So.2d 411 (La.App. 1st Cir.1961).
At the beginning of trial, plaintiffs counsel made a judicial confession which eliminated previously contested theories of po *772 tential liability on the part of defendant, thus significantly narrowing the issues to be decided by the jury. Both attorneys approved the trial judge’s proposed ^amendment to the jury charges which included the judicial confession made by plaintiffs counsel as well as an explanation to the jury of the nature and legal effect of judicial confession. The pertinent portion of the jury charge read as follows:
A judicial confession is a declaration made by a party in a court proceeding. The judicial proceeding is an admission or confession as to a certain aspect of the case.
In this case there has been a judicial confession by plaintiff counsel, Mr. Hammons, that:
(1) the decision by physicians not to send Mr. Glasscock to ' ICU was within the applicable standard of care;
(2) the CT scan of Mr. Glasscock’s head and brain was properly interpreted and there was no intracra-nial injury when Mr. Glasscock was admitted to LSU; specifically, the interpretation of the CT scan by LSU was within the applicable standard of care; and
(3) the decision by LSU to send Mr. Glasscock to the telemetry unit/floor instead of ICU was within the applicable standard of care.
In referring to the judicial confession during closing arguments, specifically his rebuttal, plaintiffs counsel asserted:
I also said was that there was no injury, [Mr. Glasscock] did not suffer a brain injury ... so therefore, ladies and gentlemen those multiple injuries that killed Mr. Glasscock something else happened while he was a patient at LSU.
Did they drop him off the gurney when they took him to the CT scan at 8:40, did an injury take place, did they give him a wrong medicine, how did he end up with bleeding in the head, bleeding in the brain, how did he end up with bilateral contusions in the frontal part of the brain and cerebral edema when LSU itself agrees that those injuries were not present when [Mr. Glasscock] was transferred there from Springhill[?]
This second injury theory was not specifically pled in plaintiffs complaint, yet the allegations in the petition were broad enough to encompass such a |sntheory. However, mere speculation and argument, without any testimony or evidence whatsoever to support the conclusion that such an injury took place, is insufficient to establish that a second injury in fact did occur, much less that such an injury was a precipitating cause of Mr. Glasscock’s death.
One of plaintiffs medical experts, Dr. Trip Edwards, testified that while Glas-scock’s medical record reflected no significant head or brain injuries noticed by the LSUHSC physicians, the autopsy revealed very significant cranial involvement, such as cerebral edema, subarachnoid hemorrhage and bilateral frontal lobe contusions. Dr. Edwards testified without objection that upon Mr. Glasscock’s admission to LSUHSC, his whole body was CT scanned, so there are three possibilities:
(1) whoever was looking at x-rays and scans wasn’t reading them correctly;
(2) the injuries weren’t there at the time of the scan/x-ray; or
(3) the injuries were there but they weren’t significant enough at that time to be visible or to manifest themselves on the tests.
Plaintiffs second medical expert, Dr. Walter Simmons, also noted that significant brain injury previously undetected . was disclosed during Mr. Glasscock’s autopsy. Such an injury, opined Dr. Simmons, could have had an adverse effect on *773 respiration and breathing, which could have deprived Mr. Glasscock’s heart of the oxygen necessary for proper functioning. Inadequate oxygen to the heart can trigger arrhythmia or a rhythm disturbance.
Dr. Mallory Williams, assistant director of the Trauma Cener at LSUHSC in September 2008, testified that no brain injury was revealed in |slMr. Glasscock’s initial CT scans. At his autopsy it was shown that Mr. Glasscock had a very serious brain injury, one which can manifest itself with time and one that can possibly, as it progresses, interfere with respiration and cause respiratory problems. Both Dr. Simmons and Dr. Williams testified that inadequate, incomplete or shallow respira-tions can lead to arrhythmias. None of these experts, however, testified that there was some second injury or trauma that occurred while Mr. Glasscock was hospitalized at LSUHSC.
Plaintiff, Carolyn Glasscock, testified that she and her daughter-in-law, Tammy Miller, were in Mr. Glasscock’s room the evening of September 26, 2008, until the early morning hours of September 27. She did not testify that Mr. Glasscock fell off his bed or was dropped while he was in his room in the Telemetry Unit, nor did she testify that he appeared to have sustained new, additional injuries during the transport to or from Radiology.
The judicial confession and jury instruction, which simply established, for the purposes of this assignment of error, that the CT scan of Mr. Glasscock’s head and brain was properly interpreted and Mr. Glasscock did not have an intracranial injury when admitted to LSTJ, did not address how or if such an injury occurred or if it did, its causative effect, both questions having been left entirely to the jury to determine. Further, as noted by Dr. Edwards, the head injuries were not so significant at the time Mr. Glasscock was admitted to be visible or to manifest themselves on the initial tests. As already discussed, the jury found that there was no breach |32of the applicable medical standards by LSUHSC employees in their care and treatment of James Glasscock. This conclusion includes an implicit rejection of plaintiffs second injury theory and, as it is supported by a reasonable factual basis and is not manifestly wrong, it will not be overturned by this court on appeal.

Conclusion

For the reasons set forth above, the trial court’s judgment rendered in accordance with the jury’s verdict and the judgment and amended judgment denying plaintiffs motion for JNOV and/or new trial are AFFIRMED.

. While the initial pleading and others filed thereafter refer to Mrs. Glasscock as "Caroline,” her name in fact is "Carolyn.”

. Defendant’s exception was filed in response to the “second injury” claim first asserted by plaintiff at trial. The jury implicitly rejected this claim when it found in favor of defendant and since this court is affirming the trial court's judgment entered in accordance with the jury’s verdict, the exception is rendered moot.

. The second judgment on plaintiff's post-trial motions was necessary to correct an error in Me first one.

. See Regions Bank v. Parish of Caddo, 42,920 (La.App.2d Cir.02/27/08), 978 So.2d 494, writ denied, 08-0669 (La.05/30/08), 983 So.2d 897; Ollis, supra; Wilson v. U.S. Fire & Casualty Co., 593 So.2d 695 (La.App, 4th Cir.1991), writs denied, 597 So.2d 1027, 1037 (La.1992).

. See Francis v. Francis, 07-1622 (La.App. 3d Cir.05/30/08), 981 So.2d 920; Randolph v. Alexandria Civil Service Commission, 04-1620 (La.App. 3d Cir.04/06/05), 899 So.2d 857, writ denied, 05-1172 (La.11/28/05), 916 So.2d 145.

. See Wise v. Bossier Parish School Board, 02-1525 (La.06/27/03), 851 So.2d 1090; In re Succession of Barattini, 11-752 (La.App. 5th Cir.03/27/12), 91 So.3d 1091; Roth, supra.